1  Andrew M. Rossoff, SBN 77958
   Senior Law Project, Inc.
2  200-B North Main St
   Lakeport CA 95453
3  (707) 263-4703
   (707) 263-0348 fax
4
   Mona Tawatao, SBN 128779
5  Legal Services of Northern California
   515 12th Street
6  Sacramento, CA 95814
   (916) 551-2150
7  (916) 551-2196 fax
8  Herb Whitaker, SBN 145560
   Legal Services of Northern California
9  190 Reamer Avenue
   Auburn, CA 95603
10 (530) 823-7560
11 David Grabill, SBN 46758
   1930 Alderbrook Lane
12 Santa Rosa, CA 95405
   (707) 528 6839
13
   Attorneys for Plaintiffs
14

15             IN THE UNITED STATES DISTRICT COURT
16
               FOR THE NORTHERN DISTRICT OF CALIFORNIA
17

18 CLEARLAKE HOUSING NOW, a not-for-profit        NO.
   Corporation, TINA NEWKIRK, KATHERINE
19 ELKINS, CHERI HAGEN and DAN HAGEN,
                                                  COMPLAINT FOR INJUNCTIVE
20        Plaintiffs,                             AND DECLARATORY RELIEF
            vs.
21
   THE CBM GROUP, Inc., a Corporation;
22 KELSEYVILLE INVESTMENT GROUP, a
   Limited Partnership; DORIAN E. MACKAY and
23 EDWARD E. MACKAY; NICE ASSOCIATES, a
   Limited Partnership, PARKVIEW I LTD.
24 PARTNERSHIP, a Limited Partnership, and DOES
   1 through 20,
25
           Defendants.
26 _____

27                              - 1 -
                              COMPLAINT

INTRODUCTION

1.   This is an action brought by residents of residential rental units that were constructed under the Rural Development Multiple Family Housing program of the United States Department of Agriculture ("USDA"). The units are under the management and control of Defendant The CBM Group, Inc., (hereinafter "CBM"), which manages approximately 3,500 residential apartment units built with USDA Rural Development Multiple Family Housing loans and/or grants in the State of California, and thousands of additional USDA-financed units outside California.

2.   Defendant CBM requires Plaintiffs and other tenants of USDA-financed residential properties under its management to sign and comply with a form of lease (hereinafter "the lease"or "CBM lease") that contains provisions that violate federal and state statutory and regulatory requirements.  In addition, the lease as well as the policies and practices it permits discriminates against individuals on the basis of disability in violation of the federal Fair Housing Act, 42 U.S.C. §3604 *et seq.,* and California laws.  Cal. Civil Code §51, *et seq..*  A copy of the CBM lease is attached hereto and incorporated herein as Exhibit A.

3.   Plaintiffs seek injunctive relief from this Court enjoining CBM from: a) requiring its tenants to sign and comply with the lease until such time as the lease is modified to remove all improper and illegal provisions; b)  enforcing the unlawful provisions in the lease; and c) unlawfully discriminating against tenants and potential tenants on the basis of disability.

4.   Plaintiffs also seek declaratory relief, and ask this Court to exercise supplemental jurisdiction over their state law claims.

II. JURISDICTION

5.   This Court has jurisdiction over this action under 42 U.S.C. §3613 and 28 U.S.C. §1331 to enforce 7 C.F.R. Pt. 1930 *et seq.* (Management and Supervision of Multiple Family Housing) and 42 U.S.C. §3601 et seq. (Fair Housing Act).

6.   This Court may issue declaratory relief pursuant to 28 U.S.C. §2201-2202 (Declaratory Judgment Act) and pursuant to Rule 65 of the Federal Rules of Civil Procedure.

1    7.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C.

2    §1367.

3                                         III. PARTIES

4    A. <u>Plaintiffs</u>

5    8.  Plaintiff Tina Newkirk is a resident of Lake County, California.  Since October 1998, she

6    and her minor child have been residential tenants at the Orchard Gardens apartment complex located

7    in Kelseyville, Lake County, California.  From October 1998, through approximately March 2003,

8    Ms. Newkirk was eligible for and received rental assistance from the USDA-Rural Development

9    ("USDA-RD") rental assistance program.  Ms. Newkirk currently receives rental assistance for her

10   apartment at Orchard Gardens through the United States Department of Housing and Urban

11   Development ("HUD") §8 Housing Choice Voucher Program.

12   9.  Plaintiff Katherine Elkins is a senior citizen (aged 70), and a resident of Lake County,

13   California.  Since February 2002, she has been a residential tenant at the Nice Village Apartments,

14   an apartment complex located in Nice, Lake County, California, which was built with loans and/or

15   grants from the USDA.  Ms. Elkins is eligible for and receives rental assistance from the USDA-RD

16   rental assistance program.

17   10.  Plaintiffs Cheri Hagan and Dan Hagan are a married couple who reside in the City of

18   Lincoln, in Placer County, California.  Since 1995 they and their three minor children have been

19   residential tenants at the Parkview I apartments in Lincoln, which were built with loans and/or

20   grants from the USDA.  Ms. and Mr. Hagan are eligible for and receive assistance from the USDA-

21   RD rental assistance programs.

22   11.  Both Ms. and Mr. Hagan have physical and mental disabilities and as a consequence

23   they both are recipients of Supplemental Security Income.  In April of 2001 they were relocated into

24   a handicapped accessible apartment at the Parkview I apartments.  Their disabilities affect their

25   ability to read and understand written materials.

26   12.  Plaintiff Clearlake Housing Now is a California public benefit non-profit corporation. Its

27

- 3 -
COMPLAINT

1  primary purpose is to support and advocate for affordable housing opportunities.

2        B. <u>Defendants</u>

3        13.  Defendant CBM is a corporation involved in the management of residential rental

4  properties.  Plaintiffs are informed and believe and on that basis allege, that Defendant CBM

5  manages approximately 3,500 rental properties constructed with loans and/or grants from the USDA

6  in various parts of the State of California.  These residential rental properties are required to be

7  managed in accordance with regulations of the USDA and applicable state and federal laws.

8        14.  Defendants Does 1 through 5 are employees and/or agents of Defendant CBM who

9  make and implement occupancy rules and  policies and are required to comply with regulations of

10  the USDA and with the laws of the United States and the State of California.

11        15.  Defendant Kelseyville Investment Group is, on information and belief, a California

12  limited partnership and owner and developer of Orchard Gardens, an apartment complex located in

13  Lake County, California.  It receives financial support for that project through USDA-RD and is

14  subject to the laws and regulations that apply to such projects.  Its principal office is located in

15  Auburn, Placer County, California.

16        16.  Defendant Nice Associates is, on information and belief, a California limited partnership

17  and owner and developer of Nice Village Apartments, an apartment complex located in Lake

18  County, California.  It receives financial support for that project through USDA-RD and is subject to

19  the laws and regulations that apply to such projects.  Its principal office is located in Sonoma,

20  Sonoma County, California.

21        17.  Defendant Parkview I Ltd. Partnership is, on information and belief, a California limited

22  partnership and owner and developer of the Parkview I apartments located in Placer County.  It

23  receives financial support for the project through USDA-RD and is subject to the laws and

24  regulations which apply to such projects.  Its principal office is located in Auburn, Placer County,

25  California.

26        18.  Plaintiffs are informed and believe, and on the basis of such information and belief

27

1   allege, that Defendants Dorian E. MacKay and Edward E. MacKay are the general partners of

2   Defendant Kelseyville Investment Group and are responsible in some manner for the unlawful acts

3   alleged in this complaint.

4       19.  Plaintiffs are informed and believe, and on the basis of such information and belief

5   allege, that DOES 6 through 12 are the general partners of Defendant Nice Associates and/or

6   Parkview I Ltd. Partnership and are responsible in some manner for the unlawful acts alleged in this

7   complaint.

8       20.  Plaintiffs are informed and believe, and on the basis of such information and belief

9   allege, that each of said DOES 1 through 20 is responsible in some manner for the unlawful acts

10  alleged in this complaint.  The true names and capacities of said DOES 1 through 20 are presently

11  unknown to Plaintiffs.  Plaintiffs therefore sue said DOES 1 through 20 by such fictitious names and

12  will seek leave to amend this complaint to add their true names and capacities when the same have

13  been ascertained.

14      21.  Plaintiffs are informed and believe, and on the basis of such information and belief

15  allege, that each of the Defendants is responsible in some manner for the acts alleged in this

16  complaint and that each of the Defendants was at all times relevant, the employer, employee, agent,

17  servant , principal or subsidiary of the other Defendants and at all times relevant acted within the

18  course and scope of such employment or agency.

19

20                          IV. FACTUAL ALLEGATIONS

21      22.  Defendant CBM has, at all times relevant, managed the Orchard Gardens Apartments,

22  Nice Village Apartments, and Parkview I Apartments pursuant to the terms of one or more written

23  agreement(s) between CBM and the Kelseyville Investment Group, Nice Associates, and Parkview I

24  Ltd. Partnership respectively.  Plaintiffs are informed and believe and thereon allege that CBM is

25  responsible for the overall operation of the complexes under the terms of the agreement(s),

26  including selection of tenants for the complexes, setting and collecting rents, setting and enforcing

27

1   the terms of rental agreements with tenants, and setting and enforcing occupancy rules and policies

2   of the complexes.

3       23.  USDA is the federal agency with responsibility for administration of rural housing

4   funding and programs.  Rural Development(which includes the "Rural Housing Service") is the

5   branch of the USDA with direct responsibility for administration of rural housing funding and

6   programs.

7       24.  In May 2001, CBM submitted a form of lease (together with its attachments) to USDA-

8   RD for approval.  The lease was accompanied by a letter from Lawrence Skidmore, CBM's attorney,

9   certifying that the lease was "legally sufficient and in compliance with federal and state law, as well

10  as USDA-RD regulations."

11      25.  In or about October 2001, Jeffrey Deiss, USDA-RD Multi-Family Rental Housing

12  Director for California, approved the lease for use at all CBM housing sites in California.

13      26.  In December 2001, CBM notified Tina Newkirk that the terms of her tenancy would

14  change and that she would be required to sign the newly approved lease.

15      27.  On or about December 20, 2001, Tina Newkirk filed a grievance, pursuant to the

16  USDA-RD Tenant Grievance and Appeals Procedure (7 C.F.R. §1944.551 *et seq.*) , alleging that the

17  lease violated state and federal law and applicable USDA-RD regulations.  The grievance requested

18  that the lease be modified to comply with applicable law and regulations.

19      28.  Defendant CBM held an informal conference pursuant to that grievance procedure on

20  February 5, 2002.  The grievance was not resolved at that conference and Ms. Newkirk timely

21  requested a formal grievance hearing.

22      29.  Plaintiff Newkirk's formal hearing request was not granted.  Instead, by letter dated July

23  19,  2002, Paul Rice, USDA-RD's Regional Director, declared Ms. Newkirk's grievance to be

24  "administratively closed."   Plaintiffs are informed and believe and on that basis allege, that the

25  declaration was based upon CBM's claim that it withdrew its demand that Ms. Newkirk sign the

26  lease.  However, Ms. Newkirk has not withdrawn her grievance.  Her requests that the lease be

27

---

- 6 -
COMPLAINT

1   modified to comply with applicable law and regulations and that she be offered the same lease as her

2   neighbors at Orchard Gardens remain unresolved.

3          30.  Plaintiff Newkirk currently receives rental assistance through the HUD §8 Housing

4   Choice Voucher Program.  This program is administered by the local (Lake County) housing

5   authority.  Federal regulations governing that program (24 C.F.R. §982.308) require that if the

6   property owner uses a standard lease form for rental to "unassisted tenants" (tenants not

7   participating in the Sec. 8 Housing Choice Voucher Program) in the locality or the premises, the

8   property owner must use the same standard lease form for the §8 tenant together with a form known

9   at the "HUD Tenancy Addendum" prescribed by HUD.  In addition, where the owners uses a

10  standard lease form with unassisted tenants,  the Housing Assistance Payment (HAP) contract-- the

11  agreement between with the local housing authority and the owner--must contain the owner's

12  certification that the owner used the same lease form for the Section 8 tenant.  The HAP contract

13  executed by Defendants in connection with Ms. Newkirk's tenancy contains such certification.

14  However, the CBM lease attached as Exhibit A, which is the standard form lease used by CBM in

15  the locality and at Orchard Garden premises, was not in fact the lease form used by CBM in

16  connection with Ms. Newkirk's tenancy.

17         31.  In February 2002, at the beginning of her tenancy, Plaintiff Katherine Elkins signed the

18  CBM lease.  On May 27, 2003, Plaintiff Elkins presented a grievance (pursuant to the USDA-RD

19  Tenant Grievance and Appeals Procedure) to Defendants Nice Associates and CBM alleging that the

20  lease contained improper and unlawful provisions that violated USDA-RD regulations as well as

21  state and federal laws.  That grievance, which was amended on June 2, 2003, requested that

22  Defendants modify the lease to bring it into compliance with USDA-RD regulations and applicable

23  state and federal law.

24         32.  On June 5, 2003, Plaintiff Elkins received notice from Defendant CBM's attorney,

25  Lawrence Skidmore, that "CBM would not be scheduling a grievance hearing" and "CBM will not

26  comply with . . . demands to modify Ms. Elkin's lease."

27

33.  On or about November 30, 2001 a CBM representative informed Ms. and Mr. Hagan that the terms of their lease would change and that they would be required to sign the new CBM lease.  The Hagans signed the new lease which bears the identifying designation:

"CBM/Site (05/01)    USDA-RD/All Sites/California"

34.  Plaintiffs have demanded that USDA-RD withdraw its approval of the CBM lease. Plaintiffs have also repeatedly demanded that CBM revise its lease to bring it into compliance with state and federal law and USDA-RD regulations. Defendant CBM has ignored those demands and continues to require its USDA-RD tenants throughout the State of California, other than Ms. Newkirk, to sign the lease and abide by the unlawful lease terms.

## V. ALLEGATIONS REGARDING THE CBM LEASE TERMS

35.  The CBM lease requires occupants to "be capable of self-care as required by RD regulations."  (CBM lease, Paragraph 3.A. <u>Eligibility</u>).  In fact, RD regulations do not require that an occupant be capable of "self-care".  Rather, those regulations require the property owner/manager to reasonably accommodate a tenant's disability and specifically enjoins the owner from judging whether a tenant is capable of independent living.  See 7 C.F.R. Pt. 1930, Subpt. C, Exhibit B VI D 1(I) (hereinafter "Exhibit B").

36.  The USDA-RD occupancy regulation pertaining to "guests" allows tenants to freely open their homes to their guests; however, a guest who is reasonably suspected of being an unauthorized resident may be required to provide proof of domicile by the owner/manager. See Exhibit B VIII G 9.  In contrast, ¶3. C. of the CBM lease requires the tenant to provide the landlord with a name and address of a guest staying more than 7 days.  It also states that income of a "guest" (including one who has provided proof of his or her domicile) staying more than 14 days will be considered in calculating the tenant's rent contribution to the monthly rent for the unit.  These requirements are inconsistent with and more restrictive and intrusive than those of Exhibit B VIII G 9.  They impinge on the tenant's right to privacy and association guaranteed by the United

States and California constitutions.

37.  Paragraph 9 of the CBM lease, mistitled "<u>Landlord's Duties</u>," requires tenants to waive important rights, and includes exculpatory clauses that are specifically prohibited by Exhibit B VIII E 3.  That regulation defines an "exculpatory clause" as an "agreement by  tenant . . . not to hold the landlord . . . liable for any acts or omissions whether intentional or negligent on the part of the landlord.. . ."  That CBM lease paragraph also improperly shifts the burden of inspection for and discovery of building defects to the tenant and relieves the landlord of responsibility for defects that were known to it but that were not noticed in writing by the tenant.  These provisions are inconsistent with California Civil Code Section 1941 and Exhibit B VIII D 9, which define a landlord's duty to provide habitable premises.  This requirement that tenants waive or modify their rights under Section 1941 is  "contrary to public policy" under Civil Code Section 1942.1.

38.  Paragraph 12 of the lease, entitled "<u>Repairs</u>," requires a tenant to pay the cost of any repairs needed due to tenant-caused damages on the next rent due date. Although the due date for payment may be extended by the landlord, the landlord is not required to grant the extension.  Non-payment on the due date purports to be "grounds for termination of the lease".   This lease provision violates Exhibit B VIII D 8, which requires a landlord to use separate legal proceedings (other than eviction) to collect money owed other than rent.

39.  Exhibit B XIV C 2 requires that terminations of tenancies comply with both USDA-RD regulations and state law. Subparagraph 15 C of the CBM lease, which purports to set forth grounds for termination of tenancies, is inconsistent with state and federal law and USDA-RD regulations in many respects, including, but not limited to, the following:

a)  California law makes no provision for a "72-hour" notice of termination; notice is calculated on a daily basis and the hour of the notice is not considered.

b)  Code of Civil Procedure Section 1161 limits the use of a 3-day notice to certain circumstances, some of which are inconsistent with those described in the lease.  For example, an auto accident caused by a tenant that injures a neighbor or another tenant would be grounds for

1   termination of a tenancy under ¶15. C. (1) or (2) of the lease.  A playground scuffle between

2   children that resulted in injuries or involved threats would also meet the conditions of those

3   sections.  A victim of domestic violence who inflicted an injury in self-defense would also,

4   according to the lease, be subject to termination of tenancy on a 72-hour notice.   None of these

5   examples would qualify for a 3-day termination notice under Code of Civil Procedure §1161.

6          c)  Exhibit B XIV B and C require that the termination notice specify the particular violation,

7   provide an opportunity to cure the violation and give notice to the tenant of his or her right to meet

8   with the landlord to attempt to resolve the stated violation; the CBM lease does not contain these

9   mandatory requirements.

10         d) The definition of  "outrageous" conduct in the CBM lease is so vague and all-

11  encompassing as to allow almost complete discretion for the owner/manager to terminate a tenancy.

12         40.  Subparagraph D of ¶15 of the CBM lease provides for termination of tenancies where a

13  tenant defaults on a promissory note for monies owed to the landlord.  As noted above, this violates

14  Exhibit B VIII D 8 which requires a landlord to use separate legal proceedings to collect money

15  other than rent owed by a tenant.  In addition, it implies that an opportunity to cure is not available

16  and that hardship or circumstances beyond the tenant's control will not be considered.

17         41.  Subparagraph F of ¶15 is unintelligible in that it fails to define "breach".  This

18  subparagraph implies that recurrence of <u>any</u> noncompliance or violation of the lease by a tenant will

19  constitute grounds for termination via a 30-day notice.  This is contrary to USDA-RD regulations

20  that define grounds for termination as "repeated minor violations of the lease . . . which disrupt the

21  livability and harmony of the project by adversely affecting the health or safety of any person, or the

22  right of any tenant . . . to the quiet enjoyment of the leased premises . . . or that have an adverse

23  financial effect on the project."  Exhibit B XIV A 3.

24         42.  Paragraph 16 of the CBM lease provides that a tenant grievance "shall" be in writing.

25  The Grievance Procedure mandated by USDA-RD regulations permits oral grievances.

26         43.  Paragraph 17 of the CBM lease (<u>Damage or Destruction of the Premises</u> ) contains

27

1   misstatements of law regarding the landlord's liability to the tenant for moving costs.

2

3   REQUISITES FOR RELIEF

4        44.  An actual controversy exists.  Plaintiffs submit that the standard form rental agreement

5   (the CBM lease) that Defendants require tenants and potential tenants at the Orchard Gardens

6   apartment complex, at the Nice Village Apartments, and at other apartment complexes operated

7   under the USDA-RD program to sign and abide by, violate USDA-RD regulations and federal and

8   state law.  Those violations include, but are not limited to, those violations described above.

9   Plaintiffs are informed and believe that Defendants contend that their rental agreements are

10  consistent with USDA-RD regulations and federal and state law.

11       45.  Plaintiffs will suffer irreparable harm.  Absent relief from this court, Plaintiffs will

12  continue to be subjected to unlawful, onerous and discriminatory restrictions on their use and

13  occupancy of their USDA-RD apartments.  Plaintiffs are subject to summary eviction from their

14  homes at any time if Defendants determine they are not in compliance with these unlawful

15  restrictions.  If evicted, Plaintiffs have no place to move to that they can afford to rent.

16       46.  The actions of Defendants alleged herein have proximately caused actual injury and

17  damage to Plaintiffs.  Plaintiffs anticipate that the actions of Defendants alleged herein will cause

18  them to suffer additional injury and incur additional damages in an amount to be proved at trial.

19       47.  The policies and actions of the Defendants alleged herein violate the laws of the United

20  States and the public interest entitling Plaintiffs to equitable relief.

21       48.  Plaintiffs presently have no adequate remedy at law to redress the continuing violation

22  of their rights.

23

24  FIRST CLAIM FOR RELIEF

25  Violation of Section 515 of the Housing Act of 1949<br>(42 U.S.C. §1485 *et seq.*, 7 C.F.R. Pt. 1930 *et seq.* )

26       49.  Plaintiffs reallege paragraphs 1 through 48 above, and incorporate them by

27

1  reference as though fully set forth herein.

2      50.  Section 515 of the Federal Housing Act of 1949 and its implementing regulations

3  including 7 C.F.R. Pt. 1930 *et seq.* (Management and Supervision of Multiple Family Housing) set

4  forth a property owner's obligations with respect to the operation and management of rental housing

5  developments built with USDA Rural Development Multiple Family Housing loans and/or grants.

6      51.  Defendants have failed to comply with the regulations set out in 7 C.F.R. Pt. 1930

7  Subpt. C, Exhibit B - Multiple Housing Management Handbook with respect to the rental of

8  apartment units occupied by the Plaintiffs at the Orchard Gardens apartments, Nice Village

9  Apartments, and with respect to the rental of other apartments that Defendants own or manage that

10 were built under the USDA-RD program.

11
                        SECOND CLAIM FOR RELIEF
12
                  Discrimination in Violation of the Fair Housing Act
13                         (42 U.S.C. §3601 *et seq.*)

14     52.  Plaintiffs reallege paragraphs 1 through 48 above, and incorporate them by reference as

15 though fully set forth herein.

16     53.  Persons with disabilities compose a substantial portion of the residents and potential

17 residents who are the intended lower income beneficiaries of the USDA Rural Development

18 Multiple Family Housing program.

19     54.  By requiring Plaintiffs to sign and comply with a lease that requires them to "be capable

20 of self-care," Defendants have injured Plaintiffs in violation of the federal Fair Housing Act by

21 committing the following discriminatory housing practices:

22     • Refusing to rent or otherwise making unavailable dwellings because of disability status, in

23 violation of 42 U.S.C. §3604(a);

24     • Making statements with respect to the rental that indicate a preference, limitation, or

25 discrimination based on disability, in violation of 42 U.S.C. §3604(c);

26     • Representing to persons because of their disability that a dwelling is not available for

27

1    rental when such dwelling is in fact available, in violation of 42 U.S.C. §3604(d);

2         • Interfering with any person in the exercise or enjoyment of rights guaranteed by the Fair

3    Housing Act, in violation of 42 U.S.C. §3617.

4

5                               THIRD CLAIM FOR RELIEF

6    Discrimination in Housing on the Basis of Disability in Violation of California Law
                      (Cal. Civil Code §§51, 51.5, 52, 54.1(b), 54.3)

7

8         55.  Plaintiffs reallege paragraphs 1 through 48 above, and incorporate them by reference as

9    though fully set forth herein.

10        56.  Defendants' lease requirement of capacity for "self-care" denies or interferes with the

11   individual Plaintiffs' use and enjoyment of their dwellings and violates California Civil Code §§51,

12   51.5, 52, and 54.1(b).

13        57.  Defendants' "self-care" lease requirement interferes with the efforts of Plaintiff

14   Clearlake Housing Now to aid and encourage persons in their exercise and enjoyment of their rights

15   under California law, including the right of persons to rent dwelling units without discrimination on

16   the basis of disability.

17        58.  The individual Plaintiffs are entitled to an award of up to three times the amount of

18   actual damages (in no case less than $1,000) for each violation of §51.5 and §54.1.

19

20                              FOURTH CLAIM FOR RELIEF

21   Unlawful / Unfair Business Practices
          (California Business and Professions Code §17200 *et seq.*)

22        59.  Plaintiffs reallege paragraphs 1 through 48 above, and incorporate them by reference as

23   though fully set forth herein.

24        60.  Each plaintiff is a "person" within the meaning of California Business and Professions

25   Code §17201.

26        61.  The acts of Defendants in requiring Plaintiffs and other tenants to sign and comply with

27

1   leases that contain provisions contrary to USDA-RD regulations and California landlord-tenant law

2   and Defendants' continuing failure to comply with laws and regulations governing the operation and

3   management of rental apartment units built under the USDA Rural Development Multiple Family

4   Housing program constitute unlawful and/or unfair business practices within the meaning of

5   California Business and Professions Code §17200.

6      61.  The acts of Defendants in claiming and receiving "interest credits" in connection with

7   their operation and management of USDA-RD assisted housing units while requiring the tenants of

8   those units, including Plaintiffs, to sign and comply with leases that contain provisions contrary to

9   USDA-RD regulations and federal and state law violates 7 C.F.R. Part 1930, Subpt. C, Exhibit H,

10  IV A.  These acts constitute unlawful and/or unfair business practices within the meaning of

11  California Business and Professions Code §17200.

12

13                                RELIEF DEMANDED

14      WHEREFORE, Plaintiffs pray that this Court:

15      1.     Grant declaratory relief declaring that the Defendants' actions and lease provisions

16  complained of herein to be in violation of federal law, USDA-RD regulations, state landlord-tenant

17  laws and state and federal laws prohibiting discrimination in housing on the basis of disability.

18      2.     Grant temporary, preliminary and permanent injunctive relief restraining and

19  enjoining Defendants, their employees, assignees, successors, and agents from continuing to

20  disregard their statutory duties, including, but not limited to:

21            a)    cease imposing and enforcing lease provisions that violate federal law and

22            USDA regulations;

23            b)    cease imposing and enforcing lease provisions that violate California

24            landlord-tenant laws; and

25            c)    cease violating California and / or federal fair housing laws.

26      3.     Order the defendants to deliver written notices to tenants in each USDA-RD

27

1        4.     Award damages to individual Plaintiffs as provided by law, including treble damages.

2        5.     Award such relief as necessary to prevent unjust enrichment, including, but not limited

3   to, recission of contracts, refund of monies paid, and disgorgement of ill-gotten gains, including but

4   not limited to all interest credits received by the defendants during the period of time that the

5   unlawful lease provisions were imposed on tenants by the Defendants.

6        6.     Award reasonable attorneys' fees to attorneys Andrew M. Rossoff, Senior Law

7   Project, Inc., and David Grabill as provided by law

8        7.     Grant additional relief deemed just and equitable by the Court.

9        Dated:   6/26/03

10

11                     /S/ A Ce____

                     ANDREW M. ROSSOFF

12                        MONA TAWATAO

                     HERB WHITAKER

13                        DAVID GRABILL

14                        Attorneys for Plaintiffs

15

16

17

18

19

20

21

22

23

24

25

26

27                            - 15 -

                       COMPLAINT

## VERIFICATION

I, the undersigned, declare:

I am a plaintiff in the above entitled action; I have read the foregoing COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF and know the contents thereof. The allegations of the COMPLAINT relating to my personal circumstances are true of my own knowledge, except as to those matters which are therein stated upon my information and belief, and as to those matters I believe it to be true. I am informed and believe that the other allegations of the COMPLAINT are true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _20_ day of June, 2003 Lakeport, California.

Katherine Elkins
Plaintiff

1

1 | VERIFICATION

3  I, the undersigned, declare:

4  I am a plaintiff in the above entitled action; I have read
5  the foregoing COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
6  and know the contents thereof. The allegations of the COMPLAINT
7  relating to my personal circumstances are true of my own
8  knowledge, except as to those matters which are therein stated
9  upon my information and belief, and as to those matters I
10 believe it to be true.  I am informed and believe that the other
11 allegations of the COMPLAINT are true.

12  I declare under penalty of perjury under the laws of the
13 State of California that the foregoing is true and correct.
14 Executed this 20 day of June, 2003 Lakeport, California.

Tina M. Newkirk
Tina Newkirk
Plaintiff

1

## LEASE AGREEMENT

This LEASE AGREEMENT is entered into on the _____ day of _____ 20_____ , by and

between KELSEYVILLE INVESTMENT GROUP, hereinafter called "Owner", and _TINA NEWKIRK_ _____.

hereinafter called "Tenant", covering those certain premises known as ORCHARD GARDEN APARTMENTS, Apt. No. ▮▮▮▮▮

located at 5025 GADDY COURT, City of KELSEYVILLE, County of LAKE, State of California, hereinafter called "Premises."

This Lease Agreement, herein after called lease agreement or contract, has been prepared for use in the rental of apartments which have been constructed with assistance from the Rural Development (hereinafter "RD"), United State Department of Agriculture. This Lease Agreement complies with applicable regulations issued by RD, as well as applicable federal, state, and local laws. You have the right to confer with legal council of your choice before signing this Lease Agreement.

This Lease contains provisions concerning tenant income, the basis for determining rent, and other factors, which may be different from Leases that you have previously signed. Before signing this Lease Agreement, read it carefully and ask questions if you do not understand any part of it.

This apartment complex is financed by Rural Development and is subject to the nondiscrimination provisions of Title VI of the Civil Rights Act of 1964, Title VIII of the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. All complaints concerning possible violations of these provisions should be directed to the Administrator, Rural Development, United States Department of Agriculture, Washington D.C., 20250. In addition, complaints of violations of fair housing laws may be sent directly to the Secretary of Housing and Urban Development, Washington, D.C., 20410.

1. Owner hereby rents to Tenant and Tenant hereby rents from Owner from year-to-year, on the terms and conditions herein set forth, the above-specified Premises. The terms Owner, Borrower, Landlord, Agent and Management are used interchangeably in this Agreement.

2. TERM: The lease shall be from year-to-year beginning on _January 1_ , 20_02_ . The lease shall be automatically renewed unless terminated by Owner/Agent or Tenant by the methods in covenants 14 and 15 and other provisions of this contract.

3. OCCUPANTS: Tenant agrees that the apartment shall be occupied only by the person(s) listed below. Before any additional persons are allowed to reside in the apartment, each additional person requesting to reside in the apartment must submit an application and meet the screening criteria of the Owner/Agent. If Tenant permits an additional persons to reside in the apartment in violation of these requirements, Tenant's lease will be terminated.

| NAME | DATE OF BIRTH | SOCIAL SECURITY # | DRIVERS LIC # |
|---|---|---|---|
| TINA NEWKIRK | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |
| | | | |
| | | | |
| | | | |
| | | | |

A. Eligibility. Eligibility of the above person(s) to be occupant(s) of the apartment is determined by the information provided by Tenant to Owner/Agent regarding age, income, family size, credit and criminal report. To be eligible, occupant(s) must be capable of self-care as required by RD regulations. Proper certification is a requirement for eligibility for occupancy.

If the unit becomes overcrowded or underutilized or should the Tenant no longer meet the eligibility requirements of the project during the term of the Lease Agreement, he/she will be required to vacate the unit at the end of the Lease term unless eligibility can be established following specified steps, such as moving to an appropriate size unit, or an exception is granted by Owner/agent.

Tenant understands that he/she will no longer be eligible for occupancy in this project if his/her income exceeds the maximum allowable adjusted income as defined periodically by the Rural Development for the State of California. Tenant agrees to immediately notify the Landlord when there is a change in Tenant's gross income or adjustment to income, or when there is a change in the number of persons living in Tenant's household. Tenant understands his/her rent or benefits may be affected as a result of this information. Tenant also understands that failure to report such changes may result in losing his/her

Initials    Initials    Initials    Initials

 

benefits to which he/she may be entitled or may result in the Landlord taking corrective action if benefits were erroneously paid to Tenant. Tenant understands the corrective action the Landlord may take includes the initiation of a demand for repayment of any benefits or rental subsidies improperly received, initiation of a notice to cancel any rental assistance or Section 8 assistance being received for the balance of Tenant's certification period, initiation of a notice to increase Tenant's monthly rent to $_____ per month (note rate rent for Plan II Projects), or initiation of a notice of termination of tenancy. Tenant understands that one or more of these remedies may be initiated at the option of Landlord.

B.  Maximum Income.  If the Complex is also governed under the IRC Section 42 – Low Income Housing Credit, Tenant's Gross Annual Income must be below the Tax Credit maximum limit before Tenant(s) move in to the complex, and certified by providing household income and asset information.

C.  Guests.  Tenant is permitted to have guests visit his/her household according to the rules set forth herein. Anyone who stays in the apartment unit who is not an authorized occupant on this Lease Agreement will be treated as a guest. The apartment unit is to be used only as Tenant's private dwelling, and Tenant may not sublease or take in lodgers. If Tenant's guest(s) stays longer that seven (7) consecutive days, Tenant will provide Owner/Agent the name and address of each guest. Landlord reserves the right to request a written, recorded declaration of domicile or proof of domicile if Landlord suspects that the guest is an unauthorized household occupant. Such suspicion may arise whenever an adult person(s) makes recurring visits or one continuous visit of fourteen (14) days and/or nights in a forty-five (45) day period without prior written notification to Landlord. Should Tenant or the guest in question not provide the requested information needed to confirm such guest's domicile, or should the facts be sufficient to evidence such guest's domicile in Tenant's apartment unit, then Landlord may consider such guest a member of Tenant's household and may enforce any Lease provisions shown to be violated and/or require Tenant to be re-certified. If a guest stays in Tenant's unit longer than fourteen (14) days in a forty-five (45) day period, such guest's income may be considered in recalculating Tenant's rent contribution. Tenant's rent contribution will not be recalculated if such guest resides in Tenant's apartment in order to assist Tenant during recovery from serious illness or injury, provided Tenant has obtained Landlord's prior written permission for such guest to reside in Tenant's unit.

D.  Size of Apartment.  The size of the apartment is determined by the number of persons or occupants as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0 Bedroom | 1 | to | 2 | people | 3 Bedrooms | 3 | to | 7 | people |
| 1 Bedroom | 1 | to | 3 | people | 4 Bedrooms | 4 | to | 9 | people |
| 2 Bedrooms | 2 | to | 5 | people | | | |

Tenant agrees to move to a unit of appropriate size, when available, if the household size changes and occupancy standards can no longer be met. If an appropriate size unit is not available, Tenant will be required to vacate the unit after being given proper notice by Management. Also, Tenant agrees to move to a unit of appropriate size if Tenant entered the complex with a Letter of Priority Entitlement and is temporarily occupying a unit for which they are not occupancy eligible.

E.  Tenant Occupying Handicapped Accessible Unit with Specially Designed Features That are Not Required by Tenant.  In the event Tenant occupies a handicap accessible unit with specially designed features that are not required by Tenant, Tenant acknowledges that priority for such units is given to those needing special physical designed features. Tenant acknowledges that he/she is permitted to occupy such unit only until Landlord issues a notice that a priority handicapped applicant is on the waiting list, and that Tenant must move to another suitably sized vacant unit in the project. Upon receiving such notice, Tenant agrees to move at his/her expense within thirty (30) calendar days to a suitably sized vacant unit within the project, if one is available. Tenant further understands his/her rental rate will change, when appropriate, to the rental rate for the unit he/she moves into and this Lease Agreement will be modified accordingly.

If Tenant's household includes a handicapped person, Tenant may make reasonable modifications at Tenant's own expense to an existing apartment occupied or to be occupied by such person, if Owner/Agent gives Tenant written permission in advance. Permission for a modification will be conditioned on the following:

1.  Prior approval by Owner/Agent of specific plans and drawings for the changes;

2.  Prior approval by Owner/Agent of the licensed and bonded contractor who will undertake the work;

3.  Tenant or the contractor obtains any required building permits before the work begins;

4.  Tenant deposits into Owner/Agents Security Deposit account all funds necessary to complete the work;

5.  Subject to Owner/Agent discretion and to USDA, Rural Development regulation, Tenant deposit into Owner/Agents Security Deposit account the estimated funds necessary to restore the premises to their original condition when Tenant vacates the apartment;

6.  If Tenant makes any modifications, Tenant agrees not to allow any liens to be filed against the property because of the work or restoration of the premises, and Tenant agrees that Tenant will defend and hold Owner/Agent harmless from any such liens.

CBM/Site (05/01)
USDA-RD/All Sites/California

2



Initials    Initials    Initials    Initials

    

_rohibition Against Sublease; Residential Use Only. The subject apartment unit shall be used only as Tenant's private dwelling. No business activity is to be conducted from the unit. Tenant may not lease or sublease all or any part of the apartment unit without the prior written consent of Landlord and Rural Development.

G. Transfer of Lease. Should this project be sold to a buyer approved by RD this lease will be transferred to the new owner.

4. Rent.

A. The monthly rental is $ _82_ .

B. Landlord has entered into a contract with RD, which provides that RD will pay a portion of the rent on behalf of qualified Tenants, pursuant to the United States Housing Act of 1937, as amended.

C. Tenant agrees to pay his/her monthly rent charge, in advance, promptly on the first day of each month without any obligation on the part of the owner to make demand for payment. Payment is to be made at:

_5025  Gaddy  Ct  Kekayuille  CA  95451_

D. In the event Tenant fails to pay the required monthly rent charge in full to management on or before the tenth (10th) day of each calendar month of the term, Tenant agrees to pay to owner the additional sum of $10.00, or 5% of Gross Tenant Contribution (line 30 of Tenant Certification USDA-RD form 1944-8), whichever is greater, as a reimbursement for the administrative expenses incurred by management in processing the late payment. There will also be a bank and service charge in the amount of $10.00 for any returned checks. On the second occurrence of a NSF check received from Tenant, the bank charges again will be passed on the Tenant, and thereafter all Tenant Contributions (Rent) shall be paid by cashiers check or money order.

E. Escalation Clause: RD may permit an increase in basic and market rents due to increasing costs. Landlord shall notify Tenant at least thirty (30) days before an increase in rent becomes effective, pursuant to RD regulation, 7 CFR 1930 Exhibit C-2.

4. 5. Tenant Contribution.

A. Tenant contribution may be increased or decreased because of changes in Tenant's household income or the number and ages of the people living in the apartment. As a result of these changes, monthly Tenant Contribution may be no less than basic rent of $_____ nor more than note rent $_____, unless RD approves a change in these amounts. No increase in Tenant Contribution will take place because of pre-payment of a RD loan during the term of this lease. Should any federal subsidies paid to the owner on behalf of the tenants be suspended or canceled, due to a monetary or non-monetary default by the owner and/or Management, Tenant contribution shall not change over that which it would have been required had the subsidy remained in place.

B. Tenant understands and agrees that as long as he/she receives rental assistance, his/her gross monthly contribution will be as determined on the latest Form Rural Development 1944-8, attached as an addendum to this Contract for rent and utilities (This amount can change if tenant's financial condition changes and a new 1944-8 is executed).

Tenant understands that should Tenant receive rental subsidy benefits to which Tenant is not entitled, Tenant may be required to make restitution and Tenant agrees to pay any amount of benefit to which Tenant was not entitled. Tenant also understands and agrees that his/her monthly rent under this Lease Agreement may be raised or lowered based on changes in the household income, failure to submit information necessary to certify income, changes in the number and ages of persons living in the household, and on the escalation clause in this Contract. Tenant's rent will not, however, be less than basic rate, nor more than note rate during the term of this contract. Tenant understands and agrees that his/her monthly contribution may be adjusted to no less than basic rate, nor more than note rate during the remaining term of this Lease Agreement, except that based on the escalation clause (see 4E and 5A) in this Contract, these rates may be changed by a Rural Development approved rent change. Tenant understands that every effort will be made to provide rental assistance so long as Tenant remains eligible and the Rental Assistance Agreement between the Owner and Rural Development remains in effect. However, should this assistance be terminated, Tenant may arrange to terminate this Contract, giving proper notice as set forth elsewhere in this Lease Agreement.

Tenant understands that the complex may not be 100% Rental Assistance subsidized by Rural Development. Rental assistance therefore may not be available even if the Tenant qualifies for rental assistance. The Tenant therefore will be placed on a waiting list for rental assistance.

Landlord agrees to accept a Tenant contribution without regard to any other charges owed by Tenant to Landlord, and to seek separate legal remedy according to state Landlord/Tenant law for the collection of any other charges which may accrue to Landlord from Tenant.



Initials    Initials    Initials    Initials

C. **Reporting Changes.** Tenant shall immediately inform Landlord of any permanent changes in Tenant's gross monthly household income in excess of forty dollars and/or $480 per year, sale of assets, interest income, the amount of net family assets exceeding $5,000, and of any change in household size. Landlord must recertify Tenant household whenever changes to permanent household gross income or permanent adjustments to household income result in a decrease of $20 or more per month or $240 or more per year. If the permanent gross income of a Tenant household does not exceed $20 a month or $240 annually, and the tenant requests certification, Landlord will process the recertification. Should Tenant receive rent subsidy to which Tenant is not entitled, Tenant may be required to repay these amounts.

D. **Absence From Occupancy.** Tenant understands that he/she must promptly notify Landlord of any extended absences, and that if Tenant does not personally reside in the unit for a period exceeding sixty (60) consecutive days, for reasons other than health or emergency, Tenant's net monthly contribution shall be raised to $_____ per month (note rate rent for Plan II Projects) for the period of Tenant's absence exceeding sixty (60) consecutive days. Tenant further understands that should any rental assistance be suspended or reassigned to other eligible Tenants, Tenant shall not be assured that such rental assistance will remain available to Tenant upon his/her return to the project. Tenant further understands that if his/her absence continues, Landlord may take the appropriate steps to terminate the tenancy. Tenant shall be required to notify Landlord, in writing, of any planned absence from the premises of two weeks or more.

6. **Recertification of Eligibility and Misrepresentation By Tenant**

A. Landlord will recalculate Tenant contribution and recertify Tenant's eligibility once a year, or sooner if any factors affecting Tenant's contribution and eligibility listed herein occur. Upon request, Tenant shall provide Landlord with the following information and documents concerning himself/herself and all other occupants of the unit: income verification, names and ages of household members. If Tenant misrepresents the facts upon which Tenant's contribution and eligibility determinations are made, Tenant shall repay all rent subsidies received by Tenant to which Tenant was not entitled to receive. Intentional misrepresentation by Tenant of such factors may subject Tenant to penalties under federal and/or state laws. Furthermore, intentional misrepresentation of such facts by Tenant shall be considered material noncompliance under this Lease Agreement, and may result in legal action against Tenant to terminate Tenant's tenancy at the project.

B. Any adjustment in Tenant Contribution caused by a change in household income, or in the number and ages of the people in the apartment, will become effective 30 days after service of notice or no later that the 1st of the month following expiration of such period.

C. Tenant understands that income verification is a requirement of occupancy, and Tenant agrees to promptly provide any certifications and income verifications required by Landlord to permit determination of eligibility, and when applicable, Tenant's contribution to be paid. Failure of the tenant to cooperate or failure of the tenant to provide the required information or provide properly executed verification forms may lead to loss of assistance, increase of rent to the note rent and termination of the tenancy.

D. Tenant acknowledges that if Tenant receives benefits to which Tenant is not entitled due to Tenant's failure to provide information, or due to inaccurate information provided by or on behalf of Tenant or other members of Tenant's household, Tenant may be required to make restitution, and Tenant agrees to repay all benefits which Tenant was not entitled to receive.

E. Tenant acknowledges that it is the tenant's responsibility to provide income information and to sign the certification form as a condition for continued occupancy. If the tenant does not provide and sign the required information and documents to be recertified in the timelines provided in the tenant's recertification notice, tenant understands that tenant's rent will be raised to note rent, as well as the maximum occupancy surcharge, if any, and that termination of tenancy proceedings will be started as of the due date of the certification. Tenant understands that an annual recertification is required for continued occupancy.

F. Tenant also acknowledges that for the recertification to be processed and submitted by the due date so that the rent does not increase to note rent and termination proceedings instituted that all documents needed to complete the certification must be returned to the landlord no later than 20 days before the expiration of the current certification.

7. **Utilities and Services.** Landlord and Tenant agree to pay for the following utilities as indicated:

**Owner Pays**

- ✓ WATER
- ✓ GARBAGE COLLECTION
- ✓ SEWER

**Tenant Pays**

- ✓ GAS
- ✓ ELECTRICITY
- ✓ TELEPHONE
- ✓ CABLE T.V.
- ✓ SATELITE DISH

  

Initials    Initials    Initials

8.   Tenant Duties. Tenant shall:

A.   Cleaning. Keep the apartment clean at all times. Tenant shall be liable for any violations of health or safety codes caused by Tenant or a person in Tenant's control.

B.   Safety. Tenant shall not use the apartment for any purpose considered dangerous to health or safety, of persons or property.

C.   Garbage. Tenant must regularly dispose of garbage in a sanitary manner. Only normal household garbage shall be disposed in the garbage can or dumpster. Radios, televisions, stereos, furniture such as tables, chairs, couches, beds, etc, any large items are not considered normal household garbage and are not to be deposited in or near the garbage can or dumpster. The tenant shall haul away such items or make arrangements with the garbage hauler to dispose of such items and shall pay for their removal.

D.   Use of Property. Tenant shall properly use property of the project, including heaters, plumbing, appliances, and any other items. Tenant shall not damage or remove any property of the Landlord or permit any person to do so. Tenant shall pay for any damages caused by Tenant, Tenant's family, or any person Tenant invites onto the project property, reasonable wear and tear excepted.

E.   Nuisance. Tenant shall not do anything which interferes with the right of other tenants to have a safe, healthy and comfortable place to live, or which disturbs the quiet enjoyment of their apartments.

F.   Utilities. Tenant must not waste the utilities paid by Landlord.

G.   Appliances. Tenant must not install or use a dishwasher, washing machine, dryer, air conditioner, etc., without Landlord's prior written approval; prior written approval will not be unreasonably withheld. Tenant shall not tamper with the exterior lights, heating equipment, refrigerator or other appliances. Tenant will not move appliances from unit to unit.

H.   Fixtures. Tenant must not make any alterations of any nature on or to the premises. Hooks, nails, screws or other attachments shall not be installed in any ceiling. Tenant must not attach anything to the building or construct a fence without the prior written consent of the landlord. Tenant must remove any such items when Tenant leaves, without damage to Landlord's property, unless Landlord permits it to remain.

I.   Alterations. Tenant must not alter, paint, or in any way change the property, including changing of door locks or installing of additional locks, change window coverings, etc. without Landlord's prior written approval. A full, written proposal must be presented to Landlord as a condition of consideration for approval.

J.   Install. Tenant must not install television or radio reception device on the Premises.

K.   Pet Policy. No pets or other animals may be kept in the apartment unit without Landlord's prior written approval; provided however, Tenant and/or members of Tenant's household may keep a seeing eye or hearing ear animal in the apartment unit if required by Tenant or a member of Tenant's household to achieve the normal function of Tenant or member of Tenant's household.

If the project or portion of the project is specifically designated for the elderly, Tenant may keep commonly accepted household pets in his/her apartment unit, subject to reasonable written rules which will be provided to Tenant with this Lease. In the event Landlord reasonably determines the conduct or condition of a pet in the project constitutes a nuisance or threat to the health or safety of other Tenants or persons in the project, Landlord may cause such pet to be removed from the project.

L.   It is understood that the use, attempted use, or possession, manufacture, sale, or distribution of an illegal controlled substance (as defined by local, State, or federal law) while in or on any part of this apartment complex or cooperative is an illegal act. It is further understood that such action is a material lease violation. Such violations (hereafter called a "drug violation") may be evidenced upon the admission to or conviction of a drug violation.

The landlord may require any lessee or other adult member of the tenant household occupying the unit (or other adult or non-adult person outside the tenant household who is using the unit) who commits a drug violation to vacate the leased unit permanently, within timeframes set by the landlord, and not thereafter enter upon the landlord's premises or the lessee unit without the landlord's prior consent as a condition for continued occupancy by members of the tenant household. The landlord may deny consent for entry unless the person agrees to not commit a drug violation in the future and is either actively participating in a counseling or recovery program, complying with court orders related to a drug violation, or completed a counseling or recovery program.

The landlord may require any lessee to show evidence that any non-adult member of the tenant household occupying the unit, who committed a drug violation, agrees to not commit a drug violation in the future, and to show evidence that the person is either actively seeking or receiving assistance through a counseling or recovery program, complying with court orders



Initials   Initials   Initials

   

related to a drug violation, completed a counseling or recovery program within timeframes specified by the landlord as a condition for continued occupancy in the unit. Should a further drug violation be committed by any non-adult person occupying the unit the landlord may require the person to be severed from tenancy as a continued occupancy by the lessee.

If a person vacating the unit, as a result of the above policies, is one of the lessees, the person shall be severed from the tenancy and the lease shall continue among any other remaining lessees and the landlord. The landlord may also, at the option of the landlord, permit another adult member of the household to be a lessee.

Should any of the above provisions governing a drug violation be found to violate any of the laws of the land the remaining enforceable provisions shall remain in effect. The provisions set out above do not supplant any rights of tenants afforded by law.

M.  Smoke Detectors. Tenant shall not remove or tamper with any properly functioning smoke detectors, including, removing any working battery. The tenant will be liable for up to the maximum penalty set forth by state or federal law governing tampering with smoke detectors. It is the tenant's duty to test all smoke detectors at least once each six months and to replace the batteries in smoke detectors when necessary to keep the smoke detector functioning. If upon testing, it is determined that the smoke detector does not function, and such malfunction is not corrected by the replacement of a battery, the tenant shall immediately notify the landlord in writing.

N.  Firearms. Tenant shall not have in their possession nor allow to be stored on the premises any firearms, ammunition, or reloading supplies such as powder and primers.

O.  Exceptions. If Landlord gives special permission or fails to enforce these duties against some tenants, it does not mean that the Tenant is not bound by them. If Tenant has any problems or concerns, please discuss them with Landlord.

P.  Costs. Tenant shall reimburse Landlord for any costs incurred as a result of violations by Tenant of any of the obligations in this Section 9.

9.  Landlord's Duties. Tenant acknowledges that as the occupant of the premises, he or she is in a better position than Owner/Agent to observe conditions in the premises affecting their habitability. Tenant agrees to notify the Owner/Agent in writing immediately upon observing any condition affecting the habitability of the Premises. Tenant agrees on behalf of him/herself, his/her dependents, guests, personal representatives, legal representatives, heirs, assigns to release, waive, discharge and hold harmless Owner/Agent from any and all claims, demands or damages arising from conditions within the Premises affecting their habitability about which Tenant failed to notify the Owner/Agent in writing. In addition to other duties in this lease, Landlord agrees to do the following:

A.  Maintenance. Maintain the apartment building and community areas in a decent, safe, and sanitary condition in accordance with local housing codes and RD regulations.

B.  Infestation. Exterminate all insects, rodents, and other pests, provided however, Tenant shall reimburse Landlord for the expense of such extermination if the insects, rodents, and/or other pests were present in the premises as a direct result of Tenant's, their occupant's, or guests' failure to clean or remove garbage or debris from the premises.

C.  Locks. Provide adequate locks and furnish initial keys to Tenant.

D.  Garbage. Provide and maintain garbage receptacles in common areas, and arrange for the regular removal of trash.

E.  Rules. Give Tenant copies of apartment rules, the tenant grievance procedure, or tenant's rent calculations upon request.

F.  Liability. Landlord may be liable for failure to maintain the apartment building in accordance with this section 9.

G.  Improvements. Interior improvements will be made in accordance with the complex Management Plan. Condition of the unit during the Annual Apartment Inspection will be taken into consideration when determining the need for interior improvements. If the Annual Apartment Inspection reveals poor housekeeping habits or Tenant abuse/damage to the unit, interior improvements may be postponed until (1) overall housekeeping habits are improved and tenant damage is repaired (at tenant expense) as determined by the next Annual Apartment Inspection or (2) Tenant vacates the unit.

Alternatively, should a Tenant take exceptional care of the unit and planned improvements are not needed, or are not desired by the Tenant, Management may elect to make alternative improvements to the unit i.e. installation of ceiling fans or screen doors.

Although there is a resident employee on site, the resident employee is not available 24 hours per day to respond to tenant's concerns. In case of an emergency tenant should summon assistance by dialing "911". Tenant agrees, on behalf of him/herself, his/her personal representative, legal representative, heirs, and assignees, to release, waive, discharge and hold harmless Owner/Agent, its employees and affiliates, from any and all claims, demands or damages on account of Tenant's, his/her guest's or dependent's bodily injury, sickness, disease or death or damage or destruction to tangible personal property, including the loss-

Initials    Initials    Initials    Initials




of use thereof, arising from Tenant's acts or omissions or the non-willful acts or omissions of Owner, its affiliates, employees or successors in interest.

10.  **Apartment Inspection Report.**

   A.  Before Tenant moves in, both Tenant and Landlord will inspect Tenant's apartment for dirt, defects and other damage. Tenant and Landlord will then complete and sign the Apartment Inspection Report; Tenant and Landlord will each receive copies. By signing the Apartment Inspection Report Tenant agrees that Tenant is satisfied with the condition of the apartment and that Landlord will not be required to repaint, re-plaster, or perform any other work, except for those items specified on the report. If the need for such work arises later in the tenancy, through no fault of Tenant, the Landlord is obligated to perform such work.

   B.  When Tenant leaves the apartment, Tenant and Landlord will inspect the apartment and complete and sign a second Apartment Inspection Report. It is Tenant's duty to leave the apartment in as good condition as received, normal wear and tear excepted. This second report will assess whether Tenant has damaged or failed to clean the apartment, and any withholding of money from Tenant's security deposit will be based on this report. In the event Tenant terminates the lease agreement without an inspection, Landlord will make the inspection and will notify Tenant of any charges which are to be deducted from the deposit in accordance with Item 11 of this agreement.

11.  **Security / Damage Deposit.**

   A.  **Amount.**  Tenant must pay a security deposit of $ ___250___ (an amount equal to basic rent). If Tenant is eligible for rental assistance or Section 8 assistance, and Tenant demonstrates that he/she cannot afford to pay all of the security deposit at once, Landlord will arrange a reasonable monthly payment program for such security deposit in accordance with RD regulations. For RD projects, the down payment on such security deposit may not exceed thirty percent (30%) of Tenant's adjusted monthly income, and monthly payments shall be $15.00 per month or that amount necessary to complete payment of the security deposit within three (3) months, whichever is greater. However, Landlord may implement a payment plan to extend payments over a longer term if necessary. For RD projects, the down payment on such security deposit may not exceed $25.00, and monthly payments shall be in an amount sufficient to complete payment of the security deposit within three (3) months. However, Landlord may extend the payment period for longer than three (3) months if necessary. Should Tenant fail to make the payments required on his/her security deposit, the entire security deposit shall become due and payable in full. Failure to pay the security deposit when due will be grounds for termination of the lease.

   When a note is going to be used for part of the security deposit, the following payment schedule will be followed:

   | First payment due | _____ | in the amount of $ _____ |
   | Second payment due | _____ | in the amount of $ _____ |
   | Third payment due | _____ | in the amount of $ _____ |

   B.  All security deposits shall be handled in accordance with state or local laws governing security deposits.

   C.  **Tenant Duties.**  When Tenant vacates the apartment, Landlord may retain a portion or all of the security deposit for the following expenses:

   1)  Any outstanding rent, fees, and charges still owed by Tenant;

   2)  A fee of $ ___2.00___ for any key not returned by Tenant;

   3)  Any cost incurred as a result of Tenant's failure to leave the apartment unit reasonably clean, as a result of damage to the apartment unit other than normal wear and tear, or as a result of missing or lost furnishings or equipment. If the apartment unit is not cleaned by Tenant, the cost of cleaning the apartment unit will be deducted from Tenant's security deposit.

   D.  **Refunds.**  Tenant shall provide Landlord with a forwarding address to enable Landlord to forward an accounting of the security deposit, together with a refund of the balance, if any, of the security deposit to Tenant. Landlord will forward such accounting and the balance of the security deposit to Tenant within thirty-one (21) days. Such accounting shall include a full statement specifying grounds for retaining any or all of the security deposit, together with a list of items deducted and their cost. If Tenant fails to provide Landlord with a forwarding address, Landlord will forward the accounting and balance of the security deposit to Tenant at Tenant's last known address in an envelope marked "Please Forward".

   E.  **Additional Costs.**  Landlord has the right to sue Tenant in state court to recover any unpaid rent, the cost of cleaning, or replacement of equipment and/or furnishings, in excess of the security deposit. If Landlord files such a suit, and if the Court determines Landlord is entitled to prevail, Tenant may also be required to pay court costs and attorney fees. If Tenant sues to recover any security deposit wrongly withheld by Landlord and prevails, Landlord may be required to pay Tenant's court costs and attorney fees.

Initials   Initials   Initials   Initials

12. **Repairs.** Tenant must pay the cost of repair for anything damaged by Tenant, a member of Tenant's household, or a guest of Tenant. Landlord is responsible for all other repairs, including those items which break down because of old age or defect. Tenant agrees to notify Landlord, in writing, about such needed repairs. In an emergency Tenant may cause repairs to be made before notifying Landlord. Landlord will repair loss of heat, water, (providing that the problem is not with the utility provider) or a life threatening condition within 24 hours of receiving notice. Landlord will restore hot water or electricity (so long as the problem is not with the utility provider) within 48 hours. Most other repairs which are the Landlord's responsibility will be performed within 30 days.

If Tenant damages something which endangers the health or safety of other tenants, and fails to repair it, Landlord may serve Tenant with a written notice specifying what repairs are to be made. If the repairs are not made within 30 days, or sooner if an emergency exists (example: fire hazard), Landlord may enter Tenant's apartment, make necessary repairs, and bill Tenant. Tenant must pay this bill on the next rent due date, unless Landlord agrees in writing to other terms of payment. Failure to pay this bill when due will be grounds for termination of this lease.

If the items damaged by Tenant do not endanger the health or safety of other tenants, Tenant must nevertheless make necessary repairs. If Tenant fails to do so, Landlord may make the necessary repairs and charge Tenant in the manner described in the preceding paragraph.

13. **Entering Apartment.** Landlord may enter Tenant's apartment unit, upon 24 hour written notice to Tenant, at reasonable times, for inspections, maintenance, repairs, or to show the apartment to prospective tenants, prospective purchasers, or other authorized persons, with Tenant's prior consent, which may not be unreasonably withheld. Landlord shall not be required to give prior notice to enter Tenant's apartment when an emergency exists or when Landlord reasonably determines Tenant has abandoned the apartment unit. When Landlord enters Tenant's apartment on an emergency basis during Tenant's absence, Landlord shall leave written notice for Tenant stating the date and time, the reason, and identifying the persons who entered Tenant's apartment unit. Landlord may make quarterly inspections as part of a preventative maintenance program. Also, RD may make inspections that they deem necessary.

14. **Termination of Lease by Tenant.** Tenant may terminate this lease by giving Landlord at least 30 days written notice. However, a tenants household tenancy still exists during the time that the tenant household's personal possessions remain in the apartment unit after the tenant household has personally ceased occupancy with the intent to leave the project, until such time the personal possessions have been removed voluntarily or by legal means, subject to the provisions of state or local law in such matters.

15. **Termination of Lease by Landlord.**

   A. **Non-payment of rent.** Landlord may terminate this tenancy for nonpayment of rent according to notice requirements of state law and RD rules and regulations. Landlord can give 3-day notice to pay rent on the 11th day if the rent is more than 10 days past due.

   B. **Other Material noncompliance** Pursuant to California Revised Statutes and Rural Development Rules and Regulations, this lease may be terminated for good cause at any time by giving the tenant written notice. Good cause is defied as repeated minor violations of the Lease Agreement which disrupt the livability and harmony of the project by adversely affecting the health or safety of any person, or the right of any tenant to the quiet enjoyment of the leased Premises and the related project, or that have an adverse financial effect on the project. The notice shall specify the acts and omissions constituting the breach and shall state that the rental agreement will terminate upon a date not less than 30 days after delivery of the notice. If the breach is remediable by repairs, payment of damages, payment of a late charge or utility or service charge, change in conduct or otherwise, that notice shall also state that the tenant can avoid termination by remedying the breach within a reasonable allotted time. If the breach is not remedied within the allotted period given, the rental contract shall terminate as provided in the notice. If Tenant refuses to vacate the apartment unit, Landlord may file an eviction suit against Tenant in state court. Tenant has the right to defend any such court action, and to present defenses and counterclaims against landlord. In such a suit, the court judge may order the losing party to pay to the prevailing party all court costs and expenses of the lawsuit, including reasonable attorney fees.

   C. **Outrageous and other conduct.** Pursuant to California Revised Statutes and Rural Development Rules and Regulations, this lease may be terminated by the Landlord, after at least 72 hours' written notice specifying the acts or omissions constituting the cause and specifying the date and time of the termination, may immediately terminate the rental contract and the Landlord may file an eviction suit against Tenant in state court. Tenant has the right to defend any such court action, and to present defenses and counterclaims against landlord. In such a suit, the court judge may order the losing party to pay to the prevailing party all court costs and expenses of the lawsuit, including reasonable attorney fees. The landlord can take the above action if:

   (1) The tenant, someone in the tenant's control or the tenant's pet seriously threatens immediately to inflict personal injury, or inflicts any substantial personal injury, upon the landlord, the landlord's agent or other tenants.

   (2) The tenant, someone in the tenant's control or the tenant's pet inflicts any substantial personal injury upon a neighbor living in the immediate vicinity of the premises or upon a person other than a tenant on the premises with permission of the landlord or another tenant.

| Initials | Initials | Initials | Initials |

 

(3) The tenant or someone in the tenant's control intentionally inflicts any substantial damage to the premises or the tenant's pet inflicts substantial damage to the premises on more than one occasion.

(4) The tenant, someone in the tenant's control or the tenant's pet commits any act that is outrageous in the extreme, on the premises or in the immediate vicinity of the premises. An act that is "outrageous in the extreme" is an act not described above but is similar in degree and is one that a reasonable person in that community would consider to be so offensive as to warrant termination of the tenancy within 72 hours, considering the seriousness of the act or the risk to others. Such an act is more extreme or serious than an act that warrants a 30-day termination under paragraph 15(b) above. An act that is "outrageous in the extreme" includes, but is not limited to the following acts by a person:

   a.   Prostitution or promotion of prostitution

   b.   Manufacture or delivery of a controlled substance

   c.   Intimidation or

   d.   Burglary

(5) If the cause for a termination notice given pursuant to subsection (3)(a), (b), (c) or (e) of this section is based upon the acts of the tenant's pet, the tenant may cure the cause and avoid termination of the tenancy by removing the pet from the premises prior to the end of the notice period. The notice shall describe the right of the tenant to cure the cause. If the tenant returns the pet to the premises at any time after having cured the violation, the landlord, after at least 72 hours' written notice specifying the subsequent presence of the offending pet, may terminate the rental agreement and take possession. The tenant shall not have a right to cure this subsequent violation.

D.   Tenant agrees that if the tenant signs a promissory note for monies owed under this contract, that the breach of the terms and conditions of that note or non-payment of monies due on that note will constitute a material breach of this lease agreement and will be grounds for termination of this lease for material non-compliance.

E.   Unless Tenant's tenancy has been terminated as provided herein or as provided under state or local law, it shall continue during any period that Tenant's household and personal possessions remain in the apartment unit, even-after Tenant and all other household members have ceased to occupy the unit, until such time as the personal property and household possessions of Tenant and his/her household members have been removed voluntarily or by legal means.

F.   If the breach is remedied but the same act or omission that constituted a prior noncompliance of which notice was given pursuant to this paragraph recurs within six months after the date specified in that notice as the date for remedying the prior noncompliance, the landlord may terminate the rental contract upon a 30 day written notice specifying the breach and the date of termination of the rental agreement.

16.  <u>Tenant's Grievance and Appeal Procedure</u>. If Tenant believes that Landlord has not acted in accordance with this lease agreement, RD Regulations, or state and local ordinances Tenant shall notify Landlord in writing within 10 days of the occurrence. This begins the grievance process under the Rural Development Administration's Tenant Grievance and Appeal Procedures. Landlord shall provide a copy of these procedures to Tenant if Tenant requests them. A copy shall be posted in project rental office. If at all possible Landlord will try to informally resolve differences.

17.  <u>Damage or Destruction of Premises</u>. If the premises are damaged or destroyed by fire or other casualty to such a degree that the premises are unsuitable-for the purposes leased, and if repairs cannot reasonably be made within (60) sixty days this lease may be terminated by landlord with approval of Rural Development. <u>Tenant should be aware that the Landlord's insurance does not cover the belongings of Tenant and Tenant is strongly advised to obtain a renter's insurance policy to cover the Tenant' property</u>. Tenant should also be aware that if the property is damaged, it is not the Landlord's responsibility to move the Tenant to new premises.

18.  <u>Rules and Regulations</u>. Tenant will receive a copy of project's Apartment House Rules before Tenant signs this lease. By signing this lease Tenant agrees to abide by those rules. Landlord may change the Apartment House Rules, but only after giving Tenant 30 days written notice and an opportunity to offer comments and suggestions. By Federal Regulations, all rules must be approved. by RD and may not be changed more than once a year unless there is an emergency.

19.  <u>Nondiscrimination</u>. Landlord shall comply with the non-discrimination provisions in Title VI of the Civil Right Act of 1964. No person shall be refused Tenancy or otherwise discriminated against because of race, color, national origin, religion, sex, age, marital status, physical or mental handicap, or any other arbitrary classification. Any discrimination complaints should be directed to the Secretary of Agriculture or to the Office of Equal Opportunity, U.S.D.A.

20.  <u>Attorney Fees</u>. In any legal action between Landlord and Tenant arising out of this lease and/or Tenant's occupation of the apartment unit, the Court may require the losing party to pay costs and attorney fees to the prevailing party.

| Initials | Initials | Initials | Initials |
|----------|----------|----------|----------|
|  | | |  |

14. **Abandonment of Unit and Personal Property**. In the event the Tenant is absent from the apartment unit for fourteen (14) consecutive days and is in default in the payment of rent during said period, the apartment unit shall be deemed abandoned by Tenant.

Any and all property of Tenant which may be left in the apartment or the buildings after the termination of this Lease or termination of Tenant's right of possession for any reason may be handled, removed, or otherwise disposed of by Owner according to State law. Owner shall in no event be responsible for any property left in the apartment or the buildings by Tenant. Tenant shall pay to Owner upon demand all expenses incurred in such disposition, including a reasonable charge for storage.

15. **Modifications**. Landlord may modify the terms and conditions of this Lease Agreement with prior RD consent, effective at the end of the initial term or a successive term of this Lease Agreement, by serving notice of such modification on Tenant, together with a revised Lease Agreement. Such notice and revised Lease Agreement or addendum shall be delivered to Tenant or an adult member of Tenant's household following the notice provisions of the notice paragraph. The date upon which such notice shall be deemed to be received by Tenant shall be the date upon which such first class letter is mailed or the date on which the copy of the notice is actually delivered to the apartment unit. Such notice must be received by Tenant or an adult member of Tenant's household at least thirty (30) days prior to the last date on which the Tenant has the right to terminate the occupancy without executing the revised Lease. Such notice must advise Tenant that he/she may appeal modifications to the Lease Agreement in accordance with Sub-part L of Part 1944 of RD regulations if such proposed modification will result in a denial, substantial reduction, or termination of benefits being received by Tenant. The notice requirements set forth in this section shall be applicable to any proposed changes to the house rules and/or occupancy regulations for the project.

16. **Attachments**. The following attachments or addendums are hereby made a part of this contract.

Required for all move-ins:

_____ Acknowledgement of Security Policy
_____ Apartment House Rules
_____ Apartment Inspection Report
_____ Drug Violation Clause
_____ Housing Allowance for Utilities
_____ Security Deposit Refund/Retention Policy
_____ Tenant Certification

Only if/when applicable:

_____ Accessible Unit Waiver
_____ Companion / Service Animal Agreement
_____ Congregate Housing (Senior Sites Only)
_____ Emergency Pull Cord System
_____ Pet Policies (Senior Sites Only)
_____ Resident Assistant Memo of Understanding
_____ Residential Service Package Waiver Request (Senior Sites only)
_____ RHCP Rental Assistance
_____ Service Package Agreement (Senior Sites Only)
_____ Unit Size Waiver
_____ USDA-RD Interest Credit
_____ USDA-RD Rental Assistance Program
_____ Other: _____

17. **Notices**. All notices given under this Lease Agreement shall be in writing and shall be delivered by Landlord to Tenant, or by Tenant to Landlord, as the case may be, in the manner prescribed by applicable state law.

Notice to Landlord. Delivery of written notice from tenant to landlord may be by the following methods: (1) personal delivery, (2) first class mail, or (3) attachment to the front door of the apartment managers or deposit in the receptacle designated as after hour depository on or next to the apartment managers door or office door and first class mail to:

Notice to Tenant. Delivery of written notice from landlord to tenant may be by the following methods: (1) personal delivery, (2) first class mail, or (3) attachment in a secure manner to the main entrance door of the apartment unit and first class mail addressed to the tenant at the premises.

18. **Signature Clause**. Both the Landlord for himself, his heirs, successors and assigns and Tenant certify that they are legally capable, have read this lease and agree to be bound by its provisions.

Signatures of ALL adult Household Members:

| X _____ | | X _____ | |
| Signature | Date | Signature | Date |
| X _____ | | X _____ | |
| Signature | Date | Signature | Date |
| KELSEYVILLE INVESTMENT GROUP | | X _____ | |
| Name of Owner / Agent | | Signature of Authorized Representative | Date |

10                          Initials    Initials    Initials    Initials